# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO (DENVER)

Civil Action No. _____

JOHN DOE, on behalf of himself and all others similarly situated,

    *Plaintiff,*

v.

PHOTOBUCKET, INC.

    *Defendant.*

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

Jason P. Sultzer (*pro hac vice forthcoming*)
Scott E. Silberfein (*pro hac vice forthcoming)*
**SULTZER & LIPARI, PLLC**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
*sultzerj@thesultzerlawgroup.com*
*silberfeins@thesultzerlawgroup.com*

Jeffrey K. Brown (*pro hac vice forthcoming*)
Blake Hunter Yagman
**LEEDS BROWN LAW, P.C**.
One Old Country Road, Suite 347
Carle Place, NY 11514
*jbrown@leedsbrownlaw.com*
*byagman@leedsbrownlaw.com*

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
*gklinger@milberg.com*

*Attorneys for Plaintiff John Doe and the Proposed Class*

Plaintiff John Doe ("Plaintiff"), on behalf of himself and all others similarly situated, brings this Class Action Complaint (the "Action") against Defendant Photobucket, Inc. ("Photobucket") for violations of federal and state law seeking actual damages, restitution, disgorgement of profit into a constructive trust, statutory damages, pre- and post-judgment interest, reasonable costs and attorneys' fees, and all other relief that this Court deems just and proper based on information and belief, as well as investigation of his counsel, as follows:

## I.    INTRODUCTION

1.    This is a data privacy class action complaint against Photobucket.

2.    Photobucket is a photo storage service that lets users save their digitized photographs by using Photobucket's internet-powered platform.  Currently, there are over 13 billion images of both consenting and non-consenting persons on the Photobucket platform – many of which originated from Twitter/X and the now defunct social media platform MySpace.  Photobucket advertised itself as a place where consumers could access their photographs while also promising to protect the data privacy and intellectual property rights of the persons in the photographs stored on its platform.

3.    Recently, however, that all has changed.

4.    Photobucket is now putting a figurative gun to the heads of the persons photographed in the images stored on their website: either remove your photos through a cumbersome opt out process or have your likeness monetized by Photobucket.  Specifically, Photobucket has rebranded itself as technology platform

that allows artificial intelligence ("AI") and facial recognition ("biometrics") to be collected from the faces found in those images. At this point, Photobucket presents a Hobson's choice between losing the memories that users chose to store on Photobucket's platform or to serve Photobucket as a cog in its AI generation and biometrics collection machine. To compound matters, many persons photographed on Photobucket's platform have no idea whatsoever that their images are still tucked within the depths of Photobucket's platform, much less that those images are now being used to train AI and to provide biometrics to Photobucket for the purpose of reselling the images to other third parties for profit.

5.    Disturbingly, many of the images subject to Photobucket's scheme are of children – like that of John Doe, who started sharing his personal and private images to Photobucket as a young teenager. Since then, Plaintiff (as well as Class members) have been presented with no meaningful choice to protect their likenesses from being used nefariously by Photobucket. At its peak, Photobucket had over 100 million users using its photograph storage platform – but, in the time since, Photobucket has had a precipitous drop off in popularity, which is likely what triggered this scheme to enrich itself at the behest of its consumers and of non-consenting persons who have no idea Photobucket is monetizing their likenesses.

6.    Against this backdrop, Plaintiff Doe and Class members bring this Action against Photobucket seeking all allowable forms of damages, including actual damages, statutory damages, restitution and disgorgement of profit into a constructive trust, as well as injunctive relief ending Photobucket's ability to continue

to enact this scheme.  Plaintiff brings his claims pursuant to the Digital Millennium Copyright Act ("DMCA"), applicable statutes that forbid biometric collection, consumer protection statutes, as well as under the doctrine of unjust enrichment.

## II.    JURISDICTION, VENUE and INTRADISTRICT ASSIGNMENT

7.    *Subject Matter Jurisdiction.*  This Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. §§ 1331, 1332 and 1338(a); specifically, this Court has subject matter jurisdiction because it asserts claims under federal law (DMCA) as well as under the Class Action Fairness Act of 2005 ("CAFA") because (1) there is minimal diversity between the litigants – namely, Plaintiff is a resident of the District of Columbia whereas Defendant's principal place of business is located in Colorado; (2) there are at least 100 members of the Class because, according to Photobucket, at least 100 million users used Photobucket at its peak; and (3) the combined claims of Class members exceed $5,000,000, exclusive of costs and interest, because the statutory damages claims alone in this Action could be in the hundreds of millions, if not billions of dollars.

8.    *Personal Jurisdiction.*  This Court has personal jurisdiction over the litigants because Photobucket is both incorporated in and maintains its headquarters in Colorado.

9.    *Venue.*  This District is the appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

10.    *Intradistrict Assignment.*  Pursuant to local rules, this Action is properly assigned to the Denver Division of the District of Colorado.

III.    PARTIES

*Plaintiff John Doe*

11.    Plaintiff Doe, at all times relevant to this Action, was either a resident of Melville, New York or of Washington, D.C.

12.    Like many consumers who use or used Photobucket, Plaintiff Doe opened a Photobucket account as a minor, over a decade ago.  Plaintiff Doe's Photobucket account is and was populated with images of himself and his friends– the majority of whom appear as minors – that he uploaded or were uploaded by Photobucket via its integration from MySpace.  At no point did Plaintiff Doe delete his Photobucket account: thus, Plaintiff's images are still on Photobucket's platform.

*Defendant Photobucket, Inc.*

13.    Defendant Photobucket, Inc. is a privately held corporation which was incorporated in Colorado, and which maintains its principal place of business in Denver, Colorado.

14.    Upon information and belief, Photobucket's platform started to become obsolete as more advanced (and secure) digital photo storage platforms entered the market.  While Photobucket was an early entrant into this market, it quickly was surpassed by new technologies provided by larger technology companies, like Apple, Inc. and Alphabet, Inc. (Google).  As Photobucket's business precipitously dropped off, it began the scheme as alleged herein.

15.    Further, Photobucket has discussed how it will sell to third parties (or already has sold) biometrics of those faces in images found on its platform.  As recipients of biometrics sans proper authorization, those third parties are also in violation of federal and state law.  Plaintiff reserves the right to add these third parties as defendants to this Action.

IV.    FACTUAL ALLEGATIONS

*The Value of Biometric and Likeness Information*

16.    *Biometrics.*  Photobucket's collection of biometric information from over 13 billion photographs is wildly illegal and offensive.  This sort of conduct has led to massive class action settlements and other multidistrict litigation which all intend to protect against the same type of harm that Photobucket causes or intends to cause.

17.    The intrinsic value of biometric information, as well as the necessity to keep it private and protected, has similarly been recognized by Courts throughout the United States.

18.    Biometric technology operates by detecting an individual's face in-person or from an image.  A facial recognition technology system then generates a unique faceprint (similar to a fingerprint) by performing an analysis of facial geometry and other features of the face, such as the distance between the nose and the mouth, the shape of the cheekbones, depth of eye sockets, and contour of the lips, ears and chin, among other unique measurements and features.

19.    Faceprints generated by facial recognition technology systems may be used by the system to verify a person's identity by conducting a one-to-one

5

comparison.  For example, U.S Customs and Border Protection uses facial recognition technology to biometrically confirm the identity of travelers that come to the United States by comparing a photo taken of the traveler at arrival against the passport photo presented by the traveler.  Facial recognition technology systems may also compare an individual's face print against a larger database of face prints to determine whether the individual matches any person included in the database.

20.    The expanded use of biometric technology, especially by private corporations like Photobucket, and the inherently personal and sensitive nature of biometric data has revealed the critical need to protect and secure consumer biometric data. States and municipalities throughout the United States have responded by enacting biometric data protection laws to protect privacy rights associated with an individual's biometric identifiers and prevent corporations from abusing and profiting from consumer biometric data.  Indeed, the following state and local legislatures have passed biometric data protection laws with numerous jurisdictions considering passing their own biometric data protection legislation imminently:

    a.  Illinois;

    b.  Texas;

    c.  Washington; and

    d.  New York City;

21.    Each of these jurisdictions have differing enforcement mechanisms, but one detail remains consistent: imposition of high statutory damages for violations in an effort to dissuade corporations from abusing consumers' biometric information.

22.    Furthermore, the Federal Trade Commission and various courts have recognized that the nonconsensual use of biometric information constitutes a violation of consumer protection statutes.

23.    *Likeness.* Photobucket's training of AI using the 13 billion images on its website is similarly highly illegal and offensive.

24.    Upon information and belief, Photobucket's collection of biometrics and the use of those biometrics for AI purposes works in tandem.  Training AI models necessarily require the use of biometric images so that the AI can learn from those facial geometries to improve AI models.

25.    As generative AI companies race to obtain large, fresh data sets of high-quality images, particularly of images of real human beings, the fight to get access to the data – like that of Photobucket – has become more intense.  Because there is only so much biometric data that can be obtained and only so much biometric data accessible through means like Photobucket, the competition to gain access to these datasets promises lucrative rewards to the aggregators of the data – like Photobucket.

26.    Like biometric information, a person's likeness – their name, face, appearance, and other qualities that make them unique – cannot easily be changed, if at all.  That is what makes this data so finite and uniquely valuable.

27.    Thus, Photobucket's collection of biometrics for training AI models is a highly profitable business regardless of how secretive, surreptitious, or unsavory it may be.

### *Defendant's Business*

28.    Photobucket was founded in 2003 as an online photo hosting platform. Initially, it was free to use and was heavily advertised to users, like Plaintiff Doe and Class members.  Upon creating an account, users could upload photos and then seamlessly share them on other platforms that were linked via Photobucket's integrations, including social media platforms.  Photobucket's integrations worked with third parties like Etsy, eBay, MySpace and Twitter/X, and Plaintiff Doe used this feature to share his photos on social media platforms.

29.    Naturally, these photos contain facial imagery of the users who posted them, but they also contain facial imagery of individuals who did not participate in the upload process or even have a Photobucket account.  These users never consented to have their likeness uploaded – and, therefore, did not consent to the collection of their biometrics or the use of their likeness to be used for generative AI models.

30.    Other information linked to each of the photograph uploads include the user's name, any information associated with the user on Photobucket, the internet protocol address ("IP address") of the user who uploaded the photo(s), descriptive fields and captions, as well as any watermarks regarding copyright laws that may have been imprinted on the images themselves.

31.    The collection of photographs and the data associated with those images was the very core of Photobucket's business model.

*Defendant's Unlawful Conduct*

32.    Photobucket's free version of the application eventually became too burdensome for it to continue, so it started to charging users as part of a subscription based service that cost $399 per year.  Starting in 2017, Photobucket began to offer users a choice: pay the subscription fee or risk losing your precious photos and memories associated with them.

33.    This led to a mass exodus of users who were unwilling to play into Photobucket's scheme.

34.    In 2018, Photobucket's "Member Bill of Rights" made assurances that:

> Photobucket will always make good-faith efforts to keep your photos secure, Photobucket understands that privacy and security will continue to be a growing concern.  We will always make privacy options available to our customers and your specific privacy settings will not be adjusted by Photobucket without prior consent from you.

35.    At some point, likely in 2023, Photobucket changed its business model to profit from the collection and resale of biometrics, which would not be possible without: (1) Plaintiff and Class members' use of the Photobucket platform for uploading and storing images; and (2) the uploading of images that contain the facial imagery of individuals that never provided consent and never had any sort of Photobucket account whatsoever.

36.    Photobucket did this through a campaign of emails to previous users beginning in 2024 – some of which had not accessed their accounts in years.  Indeed,

Plaintiff Doe had not accessed his account in over a decade, when he previously used Photobucket as a minor to upload photos of himself and his friends.

37.    These emails threatened deletion if the respective user did not comply with the new terms of service, including terms that allow for the collection of biometrics for AI training purposes.

38.    In fact, Photobucket's biometrics policy makes little effort at all to obtain necessary consent for the valuable biometric data that users (and non-users) have provided to Photobucket:

> By agreeing to our use of your biometric information, you grant Photobucket … the right to license your public user uploaded content to third parties for the scanning and processing of public user uploaded content including extracting physical features… of your biometric information (*e.g.* face, iris, etc.) for the purpose of artificial intelligence and machine learning training and the subsequent uses derived therefrom.

39.    Photobucket does not even attempt to gain the necessary required written consent, as the law demands, and this is compounded by the fact that the vast majority of users (including Plaintiff Doe) have not engaged with the platform in years.    Instead of attempting to rightfully acquire this written consent, Photobucket ineffectually offers just an opt-out option from this biometrics policy.

V.    CLASS ACTION ALLEGATIONS

40.    Plaintiff Doe, pursuant to Federal Rules of Civil Procedure 23(b) and 23(c) seeks to certify a class consisting of consumers who fall under the following definitions ("Class Members" or the "Class"):

> **Nationwide Class Definition.** All persons in the United States whose images were uploaded to Photobucket at any time during the

Class Period, January 1, 2003 through May 1, 2024.

**District of Columbia Sub-Class**. All persons in the District of Columbia whose images were uploaded to Photobucket at any time during the Class Period, January 1, 2003 through May 1, 2024.

**New York State Sub-Class.** All persons in the state of New York whose images were uploaded to Photobucket at any time during the Class Period, January 1, 2003 through May 1, 2024.

41.     Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and its affiliates, legal representatives, attorneys, successors, heirs, and assigns.

42.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

43.     *Numerosity.*    The members of the Class are so numerous that individual joinder of all Class Members is impracticable.   Class Members number in the millions.    The precise number or identification of members of the Class are presently unknown to Plaintiff but may be ascertained from Defendant's books and records.   Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

44.     *Commonality and Predominance.*   Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting individual members of the Class.   These common questions of law or fact include, but

are not limited to, the following:

     i.    Whether Defendant collected biometric identifier information from customers;

     ii.   Whether Defendant leased, traded, shared in the exchange for anything of value, or otherwise profited from the transaction of biometric identifier information;

     iii.  Whether Defendant used photographic biometric identifier information for trade purposes;

     iv.  Whether Defendant violated N.Y. Civ. Rights §§ 50, 51;

     v.   Whether Defendant violated consumer protection laws;

     vi.  Whether Defendant has been unjustly enriched by its collection and use of biometric identifier information associated with Plaintiff and the Class; and

     vii.  Whether Plaintiff and the Class are entitled to actual damages, statutory damages, exemplary damages, and/or injunctive relief.

45.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

46.    *Typicality.* Plaintiff's claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. These harms include and are not limited to (i) having their biometric identifier information collected, retained, converted, stored, and shared without their

knowledge, consent, or compensation, (ii) losing the ability and power to make informed decisions about the collection, retention, conversion, storage, sharing, and use of their biometric information, (iii) having their privacy rights and interests violated, and (iv) having Defendant profit from the collection, retention, conversion, storage, and sharing of their biometric information without providing them just compensation. Further, the damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

47. *Adequacy of Representation.* Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and Plaintiff's interests do not conflict with the interests of the Class Members he seeks to represent. Plaintiff has retained counsel competent and experienced in complex commercial and class action litigation. Plaintiff and his counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

48. *Superiority and Manageability.* A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the Class Members is relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court

system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.    By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT ONE
### VIOLATIONS OF NEW YORK CIVIL RIGHTS LAW
### N.Y. Civil Rights Law §§ 50, 51
### (ON BEHALF OF THE NEW YORK STATE SUBCLASS)

49.    Plaintiff Doe restates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

50.    Defendant employs a facial recognition technology system which collects, converts, retains, analyzes, stores and/or shares biometric identifier information, including photographic images, with third parties, including of Plaintiff Doe and Class members.

51.    Defendant uses the photographic images it obtains through its facial recognition technology system for commercial purposes, including to implement and carry out its practice of profiting from Plaintiff Doe and Class members' likeness.

52.    All of Defendant's conduct as alleged herein is done for Defendant's own business purposes and for a pecuniary benefit.

53.    Plaintiff and Class members did not consent to this conduct, nor did they provide express written consent to Defendant's uses of their photographic images for Defendant's trade purposes.

54.    Defendant has accordingly violated Plaintiff's and Class members' right to privacy, as provided by N.Y. Civ. Rights § 50, and they are entitled to damages as provided by N.Y. Civ. Rights § 51.

**COUNT TWO**
**VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**
**New York General Business Law § 349**
**(ON BEHALF OF THE NATIONWIDE CLASS,**
**ALTERNATIVELY, THE NEW YORK STATE SUBCLASS)**

55.    Plaintiff Doe restates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

56.    Defendant is considered a "business" under New York General Business Law § 349 ("GBL 349").

57.    Defendant's business acts and practices are unfair and deceptive under GBL 349.  New York has a strong public policy of protecting consumers' privacy interests, including their biometric privacy.  Defendant violated GBL 349 by collecting Plaintiff and Class members' biometric data without written consent and did so in order to profit, as explained herein.

58.    Defendant's acts and practices are "unfair" in that they are immoral, unethical, unfair, oppressive, unscrupulous, and/or substantially injurious to consumers.  The gravity of the harm of Defendant secretly collecting and sharing Plaintiff's biometric data is significant, and there is no corresponding benefit resulting from such conduct.  Finally, because Plaintiff and many Class members were completely unaware of the full breadth of Defendant's conduct, including the

15

use of their biometric identifier information for profit, they could not have avoided the harm caused by this conduct.

59.    Under GBL 349, Plaintiff seeks all available remedies, including actual damages, restitution, treble damages, statutory damages (of a minimum of $50 per violation), reasonable costs and attorneys' fees, and any other relief this Court deems just and proper.

60.    Plaintiff brings this allegation on behalf of a Nationwide Class of consumers under all other substantially similar state consumer protection laws in states around the United States.

**COUNT THREE**
**UNJUST ENRICHMENT**
**(ON BEHALF OF THE NATIONWIDE CLASS,**
**ALTERNATIVELY, THE NEW YORK STATE SUBCLASS)**

61.    Plaintiff Doe restates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

62.    Defendant received benefits from Plaintiff and Class members and was unjustly enriched by those benefits at their expense.

63.    Defendant received benefits from Plaintiff and Class members in the form of their highly profitable and valuable data, specifically biometric data, that Defendant wrongfully extracted from Plaintiff and Class members for unlawful purposes.

64.    Defendant collected, stored, retained and used this data for its own pecuniary gain, providing Defendant with economic, intangible and other benefits, including highly valuable data.

65.    The benefits that Defendant derived from Plaintiff and Class members rightfully belongs to Plaintiff and Class members.  It is against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits it received or receives from the data collected from Plaintiff and Class members.

## VI.    DEMAND FOR RELIEF

66.    WHEREFORE, Plaintiff seeks a judgment as follows:

A.    an Order certifying this Action as a class action and appointing Plaintiff and their Counsel to represent the Class;

B.    statutory damages awardable by the statute plead herein;

C.    equitable relief requiring Defendant to make the necessary disclosures with respect to biometric identifier information collection and retention;

D.    attorneys' fees, costs, and other damages to be awarded in an amount to be determined as allowable by law;

E.    reasonable expert witness fees;

F.    pre- and post-judgment interest on any amounts awarded; and,

G.    such other and further relief as this Court may deem just and proper.

## VII.    JURY TRIAL DEMANDED

67.    Plaintiff hereby demands a trial by jury for all claims so triable.

DATED: December 23, 2024          Respectfully submitted,

*/s/ Blake Hunter Yagman*

Jason P. Sultzer (*pro hac vice forthcoming*)
Scott E. Silberfein (*pro hac vice forthcoming*)
**SULTZER & LIPARI, PLLC**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
*sultzerj@thesultzerlawgroup.com*
*silberfeins@thesultzerlawgroup.com*

Jeffrey K. Brown (*pro hac vice forthcoming*)
Blake Hunter Yagman
**LEEDS BROWN LAW, P.C**.
One Old Country Road, Suite 347
Carle Place, NY 11514
*jbrown@leedsbrownlaw.com*
*byagman@leedsbrownlaw.com*

Gary M. Klinger
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
*gklinger@milberg.com*

Nick Suciu III (*pro hac vice forthcoming*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
nsuciu@milberg.com

Alexandra M. Honeycutt (*pro hac vice forthcoming*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
*ahoneycutt@milberg.com*

*Attorneys for Plaintiff John Doe and the Proposed Class*